THE STATE v. TOLL DeMOSS, Appellant.—92 S. W. (2d) 112.

Division Two, March 21, 1936. ·

*Bert Hodge, G. E. Bradley* and *Edward F. Sharp* for appellant.

*Roy McKittrick*, Attorney General, and *William W. Barnes*, Assistant Attorney General, for respondent.

COOLEY, C.—Charged with the crime of rape, by having carnal knowledge of a female under the age of sixteen years, defendant was convicted, sentenced to five years' imprisonment in the penitentiary, and has appealed.

The offense is alleged to have been committed on or about December 12, 1934, at which time the girl with whom defendant is alleged to have had sexual intercourse, one Imogene Norman, was not quite fourteen years of age. On March 17, 1935, she married the defendant and thereafter lived with him as his wife. They were so living together at the time of the trial. The information herein was filed May 8, 1935, and the trial was had May 22, 1935.

Said Imogene, then the wife of defendant, was called as a witness for the State and was permitted to be so used without objections from defendant. She testified that the defendant had never had sexual intercourse with her nor attempted to do so prior to their marriage. On the ground that he was surprised at her testimony the prosecuting attorney was permitted to cross-examine her as to prior inconsistent statements she was said to have made, but notwithstanding a somewhat vigorous cross-examination she adhered to her original testimony that the defendant had not had intercourse with her prior to her marriage to him.

Dr. O'Bannon, County Health Officer, testified that he examined Imogene Norman on December 18, 1934, which was about six days after the alleged rape. He said he found that her hymen had been ruptured but that it was not a "recent break," that the hymen had been ruptured "some time before," and had fully healed. He also said that it was impossible to tell what had caused the rupture of the hymen or whether or not the girl had had sexual intercourse after said rupture had occurred.

For proof of the essential facts necessary to constitute the crime charged the State relies upon the testimony of Catherine Norman, a sister of Imogene, who was nine years old at the time of the trial. According to her testimony the Norman family consisted of the mother, Bertha Norman Cook, and three daughters, Imogene, Catherine and Ruby Carlene. The latter's age is not shown, nor is it shown whether

or not she was at home on the night of the alleged occurrence. Neither she nor Mrs. Cook testified. From affidavits filed in support of defendant's motion for new trial it appears that there was also a son who was at his mother's home at the time in question, though he had been away for some time working in a CCC camp, but the evidence in the case does not show that, nor does it reveal even the son's existence. From Catherine's testimony it appears that the offense, if any, occurred in the house, at night, after the mother and daughters had returned from a dance. Defendant had accompanied them home. The house had but two rooms, with a door between. In the front room there was a bed "lying down on the floor." The other room is spoken of as the kitchen. Catherine said that when they got home defendant "got in bed with her" (Imogene) and that she was in the bed with them; that her mother was in the adjoining room, the kitchen, cooking some chickens. It is not clear from the record whether the door between the two rooms was open or closed. From Catherine's testimony as a whole—the only testimony on the subject in the record—we get the impression that the door was open. Neither is it clear whether or not there was a light in both rooms. Catherine first testified that there was, but later in her testimony she said there was no light in the front room where the bed was. There was a light,—a lighted lamp,—in the kitchen. Catherine testified that she had seen defendant "mess" with Imogene three times. (The term "mess" or "messing" is not explained except as hereinafter shown by Catherine's testimony.) It does not appear whether she meant three times that night, or on different occasions. If she meant different occasions there is no evidence relating to the other two. The State's case depends upon the occurrences of that night.

Catherine testified that, going home from the dance, defendant and Imogene were both drunk and that "he was messing with her, he was trying to mess with her on the road." Since her testimony as to what followed goes to the gist of the. case, we set it out in substantially her own language, but in narrative form, omitting questions and quotation marks, thus: When we got home he got in bed with her. She was still drunk, but, I don't know—he was messing with her when they got home. They were in the front room, lying on the bed. He was on top. He was messing with her, you know what I mean. He was on top of her and he was—(hesitating and laughing)—messing like—you know—like anybody else does—a man. His body was working up and down. At the time I saw him in this act there was a little stick—he was drunk too, and there was a little stick laying on the side of the bed and I hit him with it. He told me to turn over and go asleep. I guess they stayed that way (in the position above described) about ten minutes or something. Then he got off of her.

There was evidence in the case tending to show that, shortly after December 12, 1934, defendant disappeared from the neighborhood and was later arrested in Tennessee and brought back to Missouri.

Defendant, testifying for himself, denied having ever had sexual intercourse with Imogene prior to his marriage to her.

█ It is essential, in order to constitute the crime of rape, that there be penetration of the female organ by that of the male. The penetration need be but slight, but there must be penetration to some extent, and proof that there was such penetration must be adduced. We have held that such proof may be by circumstantial evidence. [State v. Hamilton, 304 Mo. 19, l. c. 26, 263 S. W. 127.] But, as generally, where the evidence is circumstantial, the proof must not only be consistent with the defendant's guilt but must be inconsistent with any reasonable hypothesis of his innocence. In the instant case the proof as to the essential fact of penetration does not measure up to that standard. All that the child, Catherine, testified to may be true and yet there may have been no penetration. It will not do merely to guess, especially in view of the testimony of Imogene—the State's witness—who *knew* whether or not the defendant had had sexual intercourse with her, and who testified that he had not. If, as the prosecuting attorney claimed, she had made statements prior to the trial to the effect that defendant had so violated her person, such prior statements, as the court properly told the jury, went only to impeach her testimony given at the trial. They did not constitute evidence of the fact charged. Concede, for the sake of argument, that her testimony at the trial was completely discredited, it still leaves the State's case, as to the essential fact of penetration, dependent solely upon the testimony of the child, Catherine, which, in view of the circumstances shown, we deem insufficient to sustain conviction.

State v. Hamilton, supra, is cited and strongly relied upon by the State. In that case the alleged injured female testified that the defendant had taken her to a hotel where he registered both, under an assumed named, as husband and wife; that during the night she awakened and found the defendant undressed and lying beside her in the bed (they had retired in separate beds); that the defendant "did something to her,"—that while he "was on top of her" she felt something in her private parts, which caused her pain. She further testified that she had stated before the grand jury that the defendant had "put his private parts in hers," which testimony before the grand jury she did not recant at the trial. Other circumstances were shown tending to corroborate the fact that the defendant in that case had indulged in sexual intercourse with the prosecutrix. In each of the other cases cited by the State on this point there was direct testimony by the alleged injured female that the defendant had had sexual intercourse with her. There is a marked difference in the facts, as shown

by the evidence, between the Hamilton case and other cases cited by respondent and the case at bar. In no case cited and in none that we have found did the alleged injured female testify that no intercourse had occurred. The story told on the witness stand by the child, Catherine, notwithstanding its seeming improbability as shown by facts and circumstances in evidence, and certain discrediting circumstances which we deem it needless to relate, may have been true. Conceding, for the purpose of the case, that the credibility of her testimony was for the jury and that she tried to tell the truth so far as she knew the facts, we are of the opinion that her testimony is insufficient, under the circumstances shown in evidence, to make a submissible case, and that defendant's demurrer to the evidence should have been sustained. It results that the judgment must be reversed.

If it appeared from the record that the State might make a better case on a retrial we might remand the case. But it does not so appear—rather the contrary. Defendant, in his motion for new trial, alleges newly discovered evidence, viz.—he says, that he was surprised at the testimony of Catherine Norman; that he and his counsel had had no opportunity to talk with her after his arrest and before the trial; that Catherine's mother and brother, William, were both present in the Norman home on the night in question; that there was a light in both rooms, with persons passing back and forth between the two rooms, and, in substance and effect, that the incidents related by Catherine could not have happened without their knowledge and did not happen. These allegations were supported by the affidavits of the mother, Mrs. Cook, and her son, William Norman, fully sustaining the allegations of the motion as to what the affiants would testify. Without passing upon the weight and credibility of the affidavits or the propriety of the court's action in refusing a new trial on that ground, we may say that it is hardly to be supposed that the affiants would testify, if called as witnesses on another trial, contrary to what they stated in their affidavits. If they should testify in accordance with their affidavits it would greatly weaken, instead of strengthen, the State's case, which we have held is insufficient on the record now before us. For this reason we can see no useful purpose to be subserved by remanding the case for new trial.

What we have said renders it unnecessary to discuss other assigned errors. The judgment of the circuit court is reversed and the defendant is discharged. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. *Tipton* and *Leedy, JJ.,* concur; *Ellison, J.,* concurs in result.